(December 2, 1891.)

# JACOBSON v. BUNKER HILL AND SULLIVAN MINING AND CONCENTRATING COMPANY.

[28 Pac. 396.]

EJECTMENT—COMMUNITY PROPERTY—SUFFICIENCY OF COMPLAINT—SPECIAL DEMURRER—ABANDONMENT.

EJECTMENT AGAINST DEFENDANT TO RECOVER MINING PROPERTY.—J. brought ejectment against defendant for the recovery of certain mining property, claiming it to be community property of her deceased mother and one K., from whom defendant deraigned title. Complaint alleges the coverture of K. and plaintiff's mother, and that the property described in the complaint was community property. Defendant objects for the first time in the appellate court that the complaint does not state facts sufficient to constitute a cause of action. *Held,* that the allegation in the complaint was sufficient after judgment; that the objection should have been raised in the court below by special demurrer for uncertainty; not having done so it is waived.

MINING PROPERTY COMMUNITY PROPERTY IN IDAHO.—Mining property acquired in this state under the laws of the United States during coverture is community property.

SAME.—Under the laws of Idaho Territory as they existed in July, 1886, all property acquired by the husband in said territory, during coverture, except such as was acquired by gift, bequest, devise or descent, was community property; and this although the wife may never have been a resident of the territory.

ABANDONMENT, EVIDENCE NOT SUFFICIENT TO ESTABLISH.—The evidence in this case examined, and held not sufficient to establish abandonment.

(Syllabus by the court.)

APPEAL from District Court, Shoshone County.

Woods & Heyburn, for Appellant.

As the complaint alleged that it was community property, that it was acquired during coverture, and that there were no debts existing against it, it was not necessary to plead the facts in detail. (Estee's Pleading and Practice, secs. 2222, 2237, 2238, 2241; Bliss on Code Pleading, sec. 222; *Gimmy v. Doane*, 22 Cal. 635; *Payne v. Treadwell*, 16 Cal. 243; *Howe v. Howe*, 4 Nev. 469; *Stutsman Co. v. Mansfield*, 5 Dak. 78, 37 N. W. 304; *Souter v. Maguire*, 78 Cal. 543, 21 Pac. 183; *Broad v. Broad*, 40 Cal. 493; *Slaterly v. Hall*, 43 Cal. 191.)  All property acquired after marriage by either husband or wife is community property, presumably. (Idaho Rev. Stats., p. 635; Act Jan. 6, 1875, sec. 2; *Broad v. Broad*, 40 Cal. 493; *Broad v. Murray*, 44 Cal. 228; *Murphy v. Jurey*, 39 La. Ann. 785, 2 South. 575; *Webre v. Lorio*, 42 La. Ann. 178, 7 South. 460; *McCall v. Irion*, 41 La. Ann. 1126, 6 South. 845; *Broad v. Murray*, 44 Cal. 228.)  The domicile of the husband is the domicile of the wife. (2 Bishop's Marriage and Divorce, 127, 129; *McKenna's Succession*, 23 La. Ann. 369; *Moore v. Thibodeaux*, 4 La. Ann. 74; *Beard v. Knox*, 5 Cal. 256, 63 Am. Dec. 125; *Kashaw v. Kashaw*, 3 Cal. 312.)  The husband having lived in Idaho, been a citizen thereof, and acquired property therein, during coverture, it is immaterial where the wife lived during that time. (Story's Conflict of Laws, sec. 474; *De Laurancel v. De Boom*, 67 Cal. 363, 7 Pac. 758.)  That a husband failed for eight years to support his wife or to live with

her was sufficient proof of intent to abandon to have sent the case to the jury.   (*Morrison v. Morrison,* 20 Cal. 431; *Benkert v. Benkert,* 32 Cal. 468; *Cline v. Cline* (Or.), 16 Pac. 282; *Osborne v. Osborne,* 44 N. J. Eq. 257, 9 Atl. 698, 10 Atl. 107, 14 Atl. 217.)

McBride & Allen, F. Ganahl, A. Hagan, and W. H. Clagett, for Respondent.

Every fact which is necessary to be proved to entitle plaintiff to recover must be alleged in his complaint, or no judgment can be sustained.   (*Green v. Palmer,* 15 Cal. 413, 76 Am. Dec. 492.)   Averments of mere evidence or legal conclusions call for no denial.   (*Racouillat v. Rene,* 32 Cal. 450.)   Unless the facts essential to the support of the case be alleged in the pleadings, evidence upon such omitted facts cannot be heard or considered.   (*Hicks v. Murray,* 43 Cal. 515.)   The property in question is held by possessory title derived under the act of Congress of 1872, and consists of mining claims on the public mineral lands of the United States.   These rights are gifts or donations derived from the United States, and are not included in the category of property which, being acquired during marriage, becomes community property.   (*Scott v. Ward,* 13 Cal. 458; *Noe v. Card,* 14 Cal. 596; *Fuller v. Ferguson,* 26 Cal. 547; *Wilson v. Castro,* 31 Cal. 433; *Hood v. Hamilton,* 33 Cal. 702; *Lake v. Lake,* 52 Cal. 428; *Broder v. Water Co.,* 101 U. S. 276; *Forbes v. Gracey,* 94 U. S. 763.)   Desertion consists of a cessation of cohabitation, coupled with the intent to desert in the mind of the offending party. · (*Morrison v. Morrison,* 20 Cal. 431.)   Mere lapse of time does not constitute abandonment. (*Moon v. Rollins,* 36 Cal. 333, 95 Am. Dec. 181; *Partridge v. McKinney,* 10 Cal. 181.)

HUSTON, J.—The facts as stated in the complaint, and shown by the record, are, in substance, as follows: On the seventeenth day of February, 1874, one Noah S. Kellogg was duly and legally married to one Mary A. Byrd, and the said parties continued in the relation of husband and wife until the death of the said Mary A., which occurred on the eighth day of July, 1886.   That during said time the said Noah S. Kel-

logg acquired and became seised and possessed of the mining property and lode claims described in the complaint, and the same became and were the community property of the said Noah S. Kellogg, and Mary A., his said wife. That on or about the first day of November, 1878, the said Noah S. Kellogg abandoned his wife, the said Mary A. Kellogg, and lived separate and apart from her all the time, and continually, until her death, at the time aforesaid, and was living separate and apart from her at the time of her death. That the said Mary A. Kellogg died intestate, leaving as her sole heirs at law the said Clarissa E. Jacobson, the plaintiff in this action, and one Josephine Ward, who were the daughters and the only children and the sole heirs at law of the said Mary A. Kellogg. That the said Josephine Ward refuses to join plaintiff, and become a party plaintiff in this action, and is not joined as one of the plaintiffs herein, for the reason of her said refusal. That no administration was ever had upon the estate of said Mary A. Kellogg, and that there were no debts or claims against the said Mary A. at her death, and that there are now no debts or claims existing against her said estate. The complaint alleges ownership, seizure, and possession by the said Noah S. Kellogg and the said Mary A., his wife, of the property described, at the time of the death of the said Mary A. The complaint alleges ouster of plaintiff by defendant; claims damages in the sum of $10,000; also avers the rents, issues, and profits of the said land, mining claims, and premises from the second day of August, 1887, and while the plaintiff has been excluded therefrom, is $100,000. And for another cause of action, and for equitable relief, the complaint states the corporate character of the defendant; ownership in fee of the plaintiff and said Josephine Ward to the various interests claimed in the property described in the complaint; the possession of the defendant; the withholding thereof from the plaintiff; waste by the defendant; the values of the entire properties at $3,000,000, and the net value of the ore being extracted therefrom at $3,000 per day; and the intention of the defendant to make large and extensive expenditures in improvements upon said property, and the exclusion of plaintiff from any knowledge or direction in regard thereto or participation therein. Prays judgment that

the plaintiff be let into possession of the described premises and every part and parcel thereof; for the sum of $10,000 damages for the wrongful withholding of said premises; and for the further sum of $100,000 for the rents, issues, and profits of said premises, and the use and working thereof by the defendant; and for injunction. The defendant Josephine Ward files a general and special demurrer to the complaint. The defendant corporation, by its amended answer, denies all the material allegations of the complaint, except the marriage of said Noah S. Kellogg and Mary A. Byrd; the death of said Mary A.; and that the plaintiff and said Josephine Ward were her children and heirs at law. Admits the ownership at one time by said Noah S. Kellogg of certain interests in the properties described in the complaint, but avers that, for the purpose of liquidating certain indebtedness incurred by him in defending and protecting his title to said properties, said Noah S. Kellogg conveyed his interests in said properties to certain parties, the grantors of this defendant; that all such purchases and transfers, as well of this defendant as its grantors, were made for an adequate and valuable consideration, in good faith, without any knowledge or information that plaintiff claimed any interest in any portion of said mining claims, or that there was or could be any doubt of the right of said Noah S. Kellogg to sell and convey the same. Answer further avers that on the 23d of December, 1887, and while defendant was in the actual and peaceable possession of said properties aforesaid, it instituted proceedings to acquire patent from the United States to the said properties; that all the requirements of the laws of the United States for the procuration of such patent were complied with by the defendant; and that at no time during the period prescribed by law was any adverse claim filed against the said application of defendant by or on the part of the plaintiff. The issues were tried before the court with a jury. After the proofs on the part of the plaintiff were in, defendant moved for nonsuit, which motion was granted by the court, and judgment of dismissal entered thereon, from which order and judgment plaintiff appeals to this court. The case is brought here on a bill of exceptions, which purports to contain all of the evidence.

The plaintiff makes the following assignment of errors: 1. The admission of testimony, against the protest of plaintiff, as to the means of support of plaintiff at the time when she was supporting her mother, as shown by folios 192 to 195 of the transcript; 2. The granting of the nonsuit against the plaintiff on motion of the defendant; 3. The refusal of the court to allow plaintiff to amend the complaint to conform to the proofs in the matter of residence of Noah S. Kellogg; 4. The refusal of the court to first try the equitable issues.

As to the first and third assignments of error, while the correctness of the ruling of the district court is, at least, very doubtful, we think it can hardly be claimed to have been prejudicial to plaintiff, as the court seems to have given but little consideration to the testimony objected to, the admission of which is assigned as error, in passing upon defendant's motion for nonsuit, and we are unable to see wherein the amendment of the complaint at the time it was asked would have benefited plaintiff, or the refusal injured her case.

The second assignment of error raises all the questions we deem material in the case, and we will now proceed to consider them.   Counsel for defendant raises the objection for the first time in this court that the complaint does not state facts sufficient to constitute a cause of action.   Conceding that such objection may be raised for the first time in the appellate court, still we think the contention of counsel cannot obtain.   It is claimed by defendant's counsel that the complaint is insufficient, in that it does not contain the exceptional words of the statute in defining what is community property, i. e., that it was not obtained by "gift, bequest, devise, or descent."   We are of the opinion that this objection cannot be raised by general demurrer, but only by special demurrer, for ambiguity and uncertainty; but we think the allegation in this case sufficient. (*Gimmy v. Gimmy,* 22 Cal. 633; *Gimmy v. Doane,* 22 Cal. 635; *Treadway v. Wilder,* 8 Nev. 91; *Souter v. Maguire,* 78 Cal. 543, 21 Pac. 183.)

The second position of defendant, that the complaint does not state that the community property was not chargeable with debts, is not tenable.   The complaint does not state that there

are no debts chargeable against "her [the plaintiff's] said estate." If this was not deemed sufficient by defendant, it should have been reached either by a special demurrer for uncertainty, or by motion to make the complaint more certain. When counsel for plaintiff tendered proof upon this matter he was interrupted by the court and informed that that was a matter of defense.

The third ground upon which defendant asked a nonsuit is that mining property, being held under a grant from the United States, is not community property. This proposition is novel, and we have examined all of the authorities cited by counsel in support of it with much care; but we find ourselves unable to agree with counsel for defendant in this contention. All the cases cited by counsel in support of this proposition arose upon Spanish, French, or Mexican grants, and there is, in our view, a manifest difference between the grants referred to in the authorities cited by counsel and the general grant under the mining laws of the United States. In the former cases it is always a special grant to the individual named, based upon grounds or considerations personal to the grantee, while in the latter it is a general grant to all the citizens, as well as those who have declared their intention to become citizens, of the republic. It is suggestive that while nearly all the mining properties in this country have been acquired under this general grant, this is the first time this question has ever come before our courts. A further answer to this contention of defendant is found in the fact that the evidence in the case shows that Kellogg acquired his interest in the properties described in the complaint by purchase, to wit, an undivided one-half interest in the Bunker Hill lode, and a three-eighths undivided interest in the Richmond lode, from Phillip O'Rourke, an undivided one-fourth interest in the Sullivan lode from Con Sullivan, and an interest in the Fraction mining claim from Joseph Klever.

The next contention of the defendant in support of the nonsuit is that the statute of Idaho, under which, and the amendments thereto, plaintiff claims, is by its terms limited to a community created in the territory, or to persons who, having been married elsewhere, come within the state and become

domiciled there.   Section 15 of an act entitled "An act defining the rights of husband and wife" (Revised Laws of Idaho of 1875, p. 634), is as follows: "The rights of husband and wife married in this territory prior to the passage of this act, or married out of this territory, but who shall reside and acquire property herein, shall also be determined by the provisions of this act, with respect to such property as shall be hereafter acquired, unless so far as such provisions may be in conflict with the stipulations of any marriage contract." The domicile of the husband, as a general rule, is the domicile of the wife.   Is there anything in this act to vary the rule or work an exception to it?   Section 2 of said act is as follows: "All property acquired after the marriage by either husband or wife, except such property as may be acquired by gift, bequest, devise, or descent, shall be common property."   This act takes from the wife her estate of dower in the realty of which her husband dies seised, which was in no wise affected by residence, and, if the contention of the defendant is correct, gives her nothing in the place of it, should she not be so fortunate as to be a resident of the state.   When we remember how very many married men there were in Idaho whose wives were nonresidents at the time of the passage of this act; when we remember, to their credit, how exceptionally careful our legislatures have been in preserving and protecting the rights of women—we are slow to believe that they ever intended to perpetrate such an outrage upon the rights of married women as the construction of this statute contended for by defendant would be.   The act, evidently and palpably, was intended to apply to and include "all property acquired after marriage by either husband or wife, except," etc.   The residence of the husband was the residence of the community, so far as property rights were concerned.

The fifth ground upon which nonsuit was asked was that there was not sufficient proof of abandonment by Kellogg of the plaintiff's ancestor to support the allegation thereof.   The statute under which plaintiff claims is an amendment to the law of the eighth session of the territorial legislative assembly of Idaho, passed at the tenth session of said legislative assembly, and is as follows: "Section 11 be amended to read as follows:

Upon the dissolution of the community by the death of the wife, the entire common property, without administration, shall belong to the surviving husband, if he shall not have abandoned and lived separate and apart from her; but if the husband shall have abandoned his wife, and lived separate and apart from her, the half of the common property, subject to the payment of the debts chargeable to it, shall be at her testamentary disposition, and, in absence of such disposition, goes to her descendants or heirs at law, exclusive of her husband," etc. It will be seen that, to entitle the plaintiff to recover in this action, it is incumbent upon her to establish that the man Noah S. Kellogg "abandoned and lived separate and apart from his wife." A man may live separate and apart from his wife, and still not "abandon" her, in the sense that the term is used in the statute, although he could scarcely abandon her without living separate and apart from her. "Abandonment," in the sense that term is used in this statute, means, we apprehend, a total relinquishment of all marital rights and a total repudiation of all marital duties, by the husband. It is largely a question of intent. It must be voluntary. An enforced absence, or an absence, although voluntary in its inception, yet prolonged by circumstances beyond the control of the husband, or for reasons or under circumstances which negative the idea of his intention to relinquish his marital rights, or to repudiate his marital obligations, is not an abandonment under this statute. This is unquestionably the sense in which the term was used in the statute. The condition of the territory and its people at the time the act was passed, as well as the language of the act itself, confirms this construction. The instances of men coming to a new mining country and bringing their wives with them in the first instance are exceptional. Hence the language of the statute "abandoned and lived separate and apart from."

Does the evidence in this case, as it appears in the record, support or establish such a case of abandonment as made it obligatory upon the court below to send the case to the jury, or was there such a failure of proof in this behalf as justified that court in granting a nonsuit? Much of the evidence which appears in the transcript, it seems to us, is *dehors* the issue. We

Dec. 1891.]    Jacobson v. Bunker Hill etc. Co.    135

Opinion of the Court—Huston, J.

do not readily see what the pecuniary condition of the plaintiff had to do with the question of the abandonment of her mother by Kellogg, any more than did her physical or moral condition. All the testimony, we believe, except that of the plaintiff, in regard to abandonment, is by deposition. The case seems to rest largely upon the testimony of the plaintiff. In fact, her testimony takes up 48 of the 56 pages of the transcript devoted to the testimony in the case. We have not the witness before us, as the district court had, but her evidence, as it appears to us in the record, is more remarkable for crispness of reply than for frankness of expression or lucidity of narrative. She states that her mother and Noah S. Kellogg were living together as man and wife at Dayton, Washington territory (now state), in October, 1878; that about the 10th of that month she received a telegram from Kellogg that his wife, the mother of the plaintiff, was very ill, and if she wished to see her alive to come at once. In response to the telegram, plaintiff went at once to Dayton; found her mother, the wife of Kellogg, suffering from a stroke of paralysis. From the evidence it appears that Kellogg was at that time not only in very straitened circumstances, but was also in poor health, although the plaintiff, when pressed in regard to these matters, upon cross-examination, seems to emulate the secretive peculiarity of the well-known Puget sound bivalve; but the fact is testified to by Mrs. Josephine Ward, a sister of the plantiff and a witness on her behalf. It seems that, shortly after the arrival of the plaintiff at Dayton, her sister, Mrs. Josephine Ward, also came there, and the two sisters remained until Kellogg left, in February, 1879. When we look into the testimony of the plaintiff to ascertain what were the circumstances under which Kellogg left, we meet with such a petulant exhibition of female asperity as renders the testimony of this witness most distressingly unsatisfactory, as instance: In the transcript appears the following, upon cross-examination of plaintiff: "Q. He went away leaving her with you in Dayton? A. He did. Q. What was the understanding between you and him about that, if any? A. There was no particular understanding. Q. What was said about it? A. There wasn't very much said about it, if anything. Q. I want to know what was said. A.

I don't know that there was anything said. Q. Did he say he was going away? A. He said he was going away, and he went. Q. Didn't he talk with you about it—give any reason for it? A. He said he was going away to work. Q. Where did he say he was going? A. He didn't say. Q. Did he give any other reason? A. He did not." Further on, to a question on cross-examination, the plaintiff states: "A. He told me that he was going away, but he didn't tell me where he was going to, or what he was going to do. Q. Was there any other conversation about his leaving than that? A. I don't think there was any between Mr. Kellogg and myself. Q. Did you ever make an affidavit in this case at the time that an application was made for a receiver? A. I did. Q. I will ask you if you did not state in that affidavit that about the 1st of February, 1879, the said Noah S. Kellogg abandoned the mother of deponent, and stated, upon his departure, to deponent, that he was badly in debt, and could do the family no good by remaining home, and that he would let deponent hear from him. Did you so state? A. Is that my affidavit? Q. You are here to say—is it or isn't it? Did you make that affidavit, I am asking you. A. I certainly expected him to do something for her, and I certainly expected to hear from him, and I think he made some such statement that I would hear from him. Q. I asked you a while ago if he made any statement of his condition and circumstances, and you said he did not. A. I don't remember of his ever saying anything about being in debt. I think he was in debt; I don't know. Q. Did you ever make any such affidavit as this: that he was heavily in debt, and could do the family no good by remaining home? A. I might have said so, but I don't remember clearly. Q. Isn't it a fact, and isn't it within your knowledge, that he was at that time involved in debt, and didn't he so state to you, that he was badly involved in debt, and that he couldn't earn anything there for the support of his wife, and that he had better go away, and you would take charge of his wife? A. I certainly had some such agreement with Mr. Kellogg, and he certainly made some such remark, that he would go away, and that if he made money he would send it to me, but he didn't tell me where he was going, and he never sent me the money."

And yet it is in the record, and admitted by her counsel on the argument here, that Kellogg did send her deeds for lots at Medical lake, from which she realized at least $300; and, from aught that appears in the record, that is all Kellogg ever earned, beyond his living, from the time of his departure from Dayton, in February, 1879, to the time of the death of his wife, in July, 1886.

As another evidence of the uncertain and unsatisfactory character of the plaintiff's testimony, we quote the following, from her cross-examination, as it appears: "Q.  I will ask the question now whether she contributed during the time she was there to the support of the family as well as after the time that Mr. Kellogg left.  A.  I contributed to the support of my mother after Mr. Kellogg left.  Q.  Did you contribute anything before?  A.  No, sir.  Q.  So that the only expense that you were to was on your own account during the time he remained there?  A.  He did not remain very long.  Q.  Well, we know about the length of time.  During that time he supported the family himself?  A.  He did not during all the time before he left.  Q.  If he didn't, who did?  A.  I think that I took complete charge not over a month after I went there, and after that I supported the family.  Mr. Kellogg was there several months afterward."

I have quoted somewhat extensively from the testimony of this witness, because hers is the only testimony in the record which bears directly upon the question of abandonment.  Mrs. Josephine Ward, a sister of the plaintiff, who, although she refused to be joined as a plaintiff in the action, appears as a witness on behalf of the plaintiff, when interrogated by the counsel for plaintiff (by deposition) as to the circumstances under which Kellogg left his wife in February, 1879, also emulates the mollusk before referred to, and replies: "I refuse to answer further, or give circumstances."  Why counsel did not press her further upon this point, we do not know.  Perhaps his experience had taught him the verity of the old distich:

> "When a woman will, she will,
>     You may depend on't;
> And when she won't, she won't,
>     And there's an end on't."

We get a little light upon this matter from the testimony of Mr. Fernando Miller, a witness on behalf of plaintiff, who says: "After Kellogg left [Dayton] I think I had a conversation with plaintiff. She was in my store, and I asked where Kellogg had gone. She said she did not know or care, and that Josie, her sister, had told him to 'git,' or some such expression. I met plaintiff a few days ago in Tacoma. She told me Kellogg claimed that he had sent her deeds to property somewhere. Don't know as she said he had sent them. Said, if he did send them, they were worthless." The plaintiff testifies: "I never learned from Mr. Kellogg where they [the deeds] came from. Mr. Kellogg never told me that he sent the deeds." And this is repeated again and again by the plaintiff, not in the same language, but to the same purport and effect; and yet the plaintiff testifies, in her examination in chief, that she received, "I don't think," to use her own language, "over $300 for the whole thing," referring to the property at Medical lake.

As before stated, the only evidence in the record bearing directly upon the question of abandonment (for we do not consider proof of mere absence evidence of abandonment) is that of the plaintiff. She testifies in her own behalf. She is playing for a large stake. She has everything to gain, and nothing to lose. She is even unsupported by that sister, who was a co-worker in the support of their invalid mother, and under whose roof the poor old invalid spent the last years of her afflicted life, after having been hawked about the territory of Washington from poor-house to poor-house for years; and this the plaintiff calls supporting her—such support, we should say, as Lear received from his pelican daughters; and it is upon such testimony that the court is asked to wrest from innocent purchasers, for value, property which the plaintiff estimates at millions of dollars in value. Every witness, including the plaintiff, who testified upon the subject, states that up to the time of his departure in February, 1879, Kellogg and his wife had always lived happily together. It may be that a man possessed of the ordinary instincts of humanity, not brutalized by debasing habits, or the indulgence of a vicious appetite, would, after having lived for years happily with a woman, borne with her the vicissitudes incident to a life in this country, it may be

that such a man would without other excuse than the failure of
her health willfully abandon the wife he had solemnly pledged
himself to support and maintain.   I say such a thing might be,
for the vagaries of the human heart and human affections are
beyond computation or estimation; but before we can make
such a conclusion the basis of judicial action, at least to the ex-
tent, and entailing the consequences, involved in this case, we
must have better assurance than is afforded by the evidence in
this record.   The judgment and order of the district court are
affirmed.

Sullivan, C. J., and Morgan, J., concurring.

### ON REHEARING.

We have carefully examined the petition for a rehearing filed
in this case, as well as the authorities cited therein.   Moreover,
we have again gone carefully through the record, and the re-
sult of our labors has been to confirm us in the opinion here-
tofore filed in this case.   We note the reference of counsel to
the provisions of the constitution of the United States and of
this state in regard to trial by jury; but counsel must be aware
that the nonapplicability of those provisions to the question
here under consideration is no longer a mooted question in this
country.   The right of the legislature to confer upon the courts
the power to grant nonsuits in certain cases has been too long
and too generally conceded to now be questioned.   Section
4354, subdivision 5 of the Revised Statutes of Idaho  provides
that the court may grant a nonsuit, "upon motion of the de-
fendant, when, upon the trial, the plaintiff fails to prove a
sufficient case  for the  jury."   In  the federal  courts of the
United States a compulsory nonsuit cannot be granted, but the
same result is reached through a peremptory instruction to the
jury.   In the case of *Schuchardt v. Allens,* 1 Wall. 359, cited
in petition, the  court says: "Whenever the  evidence  is not
legally sufficient to warrant a recovery,  it is the duty of the
court to instruct the  jury accordingly."   It  has been repeat-
edly held by the supreme courts of California and other states
whose statutes are similar to those of Idaho that the granting
of a nonsuit is a question of law.   The doctrine that, if there

is even a *scintilla* of evidence, the case must go the jury, is
exploded; and in good time, if courts are to be considered as
tribunals where the law is administered in justice. Mr.
Proffat, in his work on Jury Trial (section 107), says: "The
principle is well established, in legal investigation, that the
court is to decide upon the law, the jury upon the facts; and,.
acting upon this principle, it would seem to be within the prov-
ince of the court, when the plaintiff's evidence is submitted,.
and not controverted by the defendant, to decide on the suf-
ficiency of the evidence, and to order a nonsuit when the evi-
dence has failed to give the plaintiff a right to recover." In
*Pratt v. Hull,* 13 Johns. 334, the court says: "This must be
a power vested in the court. It results necessarily from their
being the judges of the law of the case when no facts are in
dispute." Say the supreme court of Connecticut in *Naugatuck*
*R. Co. v. Waterbury B. Co.,* 24 Conn. 468: "The jury have
nothing to do with the relevancy and materiality of evidence,.
nor with inferences of law from facts fully established or not
denied." The supreme court of Maryland (*Belt v. Marriott,* 9-
Gill, 331) held that whenever the testimony adduced by either
party "is so light and inconclusive that no rational, well-con-
structed mind can infer from it the fact which it is offered to.
establish, it is the duty of the court, when applied to for that
purpose, to instruct the jury that there is no evidence before
them to warrant their finding the fact thus attempted to be
proved." Say the supreme court of Maine, in *Connor v. Giles,.*
76 Me. 132: "There is no practical or logical difference be-
tween no evidence and evidence without legal weight. There
is no object in permitting a jury to find a verdict which a court
would set aside as often as found." We believe the true rule,.
and that which now finds very general recognition, to be that
where the evidence is such that the trial court would, in the
event of a verdict thereon, feel compelled to set it aside, it is.
the duty of the court to take the case from the jury. Nor do
we think trial courts are, or will be, over anxious to assume
this responsibility. Our experience is to the contrary. The
supreme court of Missouri administer an expressive rebuke to
the trial courts of that state for the exhibition of weakness they
give in submitting to juries cases in which a verdict ought not

to stand if rendered for the plaintiff. It will be found in nearly all the cases upon this question that the decisions have been predicated largely upon the facts of each individual case. The circumstances of this case are peculiar. The plaintiff is seeking to recover a large amount of property, valued by her at millions, and this recovery is sought against third parties, innocent purchasers for value. It is sought under a statute punitive in its character. Surely, under such circumstances, the plaintiff ought, at least, to make a *prima facie* case; but, as we have before stated, the only evidence in the case which goes directly to the question of abandonment is the testimony of the plaintiff; and she not only contradicts herself, but is contradicted by her own witnesses; and it requires no "reading between the lines," as counsel intimated, to satisfy the court of these facts. As to the *animus* on the part of plaintiff or her conduct on the witness-stand, this court has only the record to judge from. It would serve no good purpose for the court to again review the testimony. We have examined the case with all the care it is possible for us to bestow, and our conclusion is that the petition for a rehearing should be denied, and it is so ordered.

Sullivan, C. J., and Morgan, J., concur.